# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

# CATHOLIC HEALTHCARE WEST d/b/a Northridge Hospital Medical Center, Defendants.

### No. CV 06–01915 DDP (SSx).

United States District Court, C.D. California.

Jan. 3, 2008.

dant City.

Anna Y. Park, Derek W. Li, U.S. Equal Employment Opportunity Commission, Los Angeles District Office, Los Angeles, CA, for Plaintiff.

George Chester Williams, III, Julie Weber, Linda Miller Savitt, Ballard Rosenberg Golper & Savitt, Universal City, CA, for Defendants.

## ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT

[Motions filed on August 21, 2007 and October 30, 2007]

DEAN D. PREGERSON, District Judge.

This matter comes before the Court on the parties' cross motions for summary judgment or partial summary judgment. After reviewing the materials submitted by the parties and considering the arguments therein, the Court grants summary judgment for Plaintiff Equal Employment Opportunity Commission ("EEOC") on the issue of liability, and sends to the jury the question of punitive damages.

## I. BACKGROUND

Since 1997 or 1998, Catholic Healthcare West has owned Northridge Hospital Medical Center (collectively, "Defendant"), which is located in Northridge, California.[1] As part of its medical services, Defendant has a Cardiac Catheterization Laboratory ("Cardiac Cath Lab" or "Cath Lab"), which provides fluoroscopy (high intensity radiation) procedures for patients who require diagnostic and interventional cardiac care. The procedures performed in the Cardiac Cath Lab include cardiac catheterizations, angiograms, interventions to correct arterial blockages, electrical physiology studies, and implants of pacemakers and defibrillators.

The Cardiac Cath Lab team consists of approximately four members, in addition to the cardiologist or physician. The team members are either registered nurses, radiology technologists, or cardiovascular technologists. During a fluoroscopic procedure, one member of the team "scrubs"; that is, he assists the physician at the procedure table by making sure all the equipment is available for the physician. A radiology technologist operates the X-ray machine or camera. A registered nurse attends to the patient by sedating him and monitoring his vital signs, neurological status, and circulation. Then, in a separate control room, another member of the team "monitors" the fluoroscopic procedure by watching the patient's EKG and heart rhythms.

Each team must have a registered nurse to attend to the patient and a radiology technologist to operate the X-ray machine. The scrubbing and monitoring duties can be done by a registered nurse, radiology technologist, or cardiovascular technologist. When working in the room where

---

**1.** Unless otherwise noted, this background consists of facts agreed upon by the parties.

the fluoroscopy occurs, each team member wears a radiation badge to measure radiation exposure and a lead apron for protection against radiation exposure. The team member who performs the monitoring duties does not have to wear a lead apron because he works in a separate control room protected by lead glass.

Federal regulations restrict occupational workers' annual exposure to radiation. The limits for pregnant woman are lower than those applicable to men or non-pregnant women because of the sensitivity of the fetus. With respect to the radiation at issue in this case, however, the parties' experts "agree" that "a pregnant woman does not have to be removed from the cardiac cath" lab because the radiation "dose that they potentially could receive would be below the regulatory limits." (Def's. Ex. 14, Takahashi Depo. at 64.)

From January 1998 until at least April 2005, Defendant had in place the following policy:

All pregnant personnel must immediately report pregnancy status to the director. . . . The pregnant personnel shall not partake in any fluoroscopy or portable procedures during her term. This will ensure safety and protection.

(Pl's. Ex. 7, Policy # 76300.802.) [2]

From 1998 to January 2005, Diana Girard–Simone worked as a registered nurse in Defendant's Cardiac Cath Lab. She is still working for Defendant, now as Program Manager for telemetry in the cardio-vascular stepdown unit. In 2000, Girard–Simone announced her first pregnancy to her supervisor, Ken Cappella. During her pregnancy, she performed only monitoring duties in the Cardiac Cath Lab. In 2002, she informed her supervisor, Sonni Logan, of her second pregnancy. Again, she monitored exclusively for a short period, but then she miscarried. In December 2002, Girard–Simone informed management of her third pregnancy. It is undisputed that she did not work in the procedure room during her pregnancies.

From 1998 to 2001, and from 2003 through August 2004, Avril Betoushana worked as a radiology technologist in Defendant's Cardiac Cath Lab. In August 2004, Betoushana learned that she was pregnant. She informed Tony Hidalgo, the director of cardiology, of this fact. It is undisputed that after discussions with management, Betoushana was transferred to work in the Department of Radiology and ACC Data until she went on maternity leave in 2005.

On August 26, 2005 Betoushana filed a charge of sex discrimination against Defendant with the EEOC. On or about September 12, 2005, the EEOC sent Defendant a letter stating that an investigation had revealed reasonable cause to believe that such discrimination had occurred. Plaintiff EEOC then filed this action, alleging that Defendant has engaged in a pattern or practice of sex discrimination. The parties now file cross-motions for

---

2. In April 2005, Policy # 86600.1117 became effective. This policy provides that it is optional for a woman to "declare" her pregnancy officially, that only "declared pregnant women" are limited to a lower amount of radiation exposure than non-pregnant employees, and that a declaration of pregnancy may be withdrawn at any time. (Pl's. Ex. 2, Policy # 86600.1117.) "Employees who do not declare their pregnancy and their fetus/embryo will continue to be subject to the same radiation dose limits that apply to other radiation healthcare workers." (*Id.*) However, Policy # 86600.1117 does not mention Policy # 76300.802, and Defendant has not submitted any additional documentation explaining the latter policy's effect on the former. Accordingly, it is not clear whether Policy # 76300.802's provision excluding pregnant women from fluoroscopy procedures is still in effect.

summary judgment or partial summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In adjudicating a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255, 106 S.Ct. 2505.

## III. DISCUSSION

### A. *Discrimination on the Basis of Pregnancy*

Title VII of the Civil Rights Act ("Title VII") prohibits discrimination on the basis of sex. 42. U.S.C. § 2000e–2(a).[3] In 1978, Congress passed the Pregnancy Discrimination Act ("PDA"), which amended Title VII to make clear that

[t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical

conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k). Plaintiff EEOC argues that Defendant engaged in a pattern or practice of sex discrimination for at least as long as Policy # 76300.802 was in effect. The Court agrees.

■■■ Defendant urges the Court to analyze this case using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), wherein the plaintiff must make out a prima facie case of discrimination, the defendant may respond by proffering a legitimate business reason for the allegedly discriminatory action, and then the plaintiff may seal his case by showing that the proffered justification was in fact a pretext for discrimination. (Def's.Mot.11–12.) However, where a challenged policy is discriminatory on its face, this burden shifting analysis does not apply. *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1049–50 (9th Cir. 2007). Instead, a facially discriminatory "fetal-protection policy is sex discrimination forbidden under Title VII unless [the employer] can establish that sex is a 'bona fide occupational qualification.'" *Int'l Union, United Auto., Aerospace and Agric.*

---

**3.** The statute reads:

It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*Implement Workers of Am., UAW, et al. v.Johnson Controls, Inc.,* 499 U.S. 187, 200, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (quoting 42 U.S.C. § 2000e–2 (e)(1)).[4]

■ The Court finds that there is no issue of fact as to whether the policy in question discriminates on its face. Defendant concedes that Policy # 76300.802 states that "[t]he pregnant personnel shall not partake in any fluoroscopy or portable procedures during her term." The language clearly classifies pregnant people (and therefore, only women) in a manner that would tend to deprive them of employment in a fluoroscopy lab. A policy "is not neutral" for Title VII and PDA purposes when it "does not apply to the reproductive capacity of the company's male employees in the same way as it applies to that of the females." *Johnson Controls,* 499 U.S. at 199, 111 S.Ct. 1196. Defendant does not contest this fact; instead it posits several reasons why the policy nonetheless should not be considered facially discriminatory. None is convincing.

### 1. *Good Intentions*

■ Defendant admits that Policy # 76300.802 "requires pregnant employees to be removed from fluoroscopic procedures," but defends the classification on the basis that, "at the time it was adopted, [Defendant] believed that the policy was in the best interests of its pregnant employees." (Def's. Reply 3.) The Court does not challenge Defendant's good intentions. However, the Supreme Court has made clear that "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy." *Johnson Controls,* 499 U.S. at 199, 111 S.Ct.

1196. Moreover, the Court's decision, which like this case addressed a "fetal-protection policy," was issued in 1991—seven years before the effective date of Policy # 76300.802. By the time Defendant issued its new policy in 2005, fourteen years had passed since the Supreme Court had confirmed the unlawful nature of classifications on the basis of pregnancy.[5] Accordingly, Defendant should have known that even the best of intentions would not justify its discrimination against pregnant women.

### 2. *Betoushana and Girard–Simone Requested Their Own Removal from the Fluoroscopy Room*

■ Defendant claims that the policy does not discriminate on its face because Betoushana and Girard–Simone *requested* to be removed from the fluoroscopy room and allowed to perform the monitoring tasks exclusively. The EEOC counters that any such "requests" were not really requests at all because the hospital's discriminatory policy forced its pregnant employees either to leave fluoroscopy altogether or to seek an accommodation allowing them to alter their regular duties. Defendant thus urges this Court to consider whether the women requested their own removal to be a question of material fact precluding summary judgment.

Instead, the Court finds this issue to be a red herring. The undisputed evidence shows that Defendant's *facially discriminatory* policy # 76300.802 was in effect between at least 1998 and 2005, and that Betoushana and Girard–Simone were removed from the Cath Lab during this period. Betoushana testified, for example,

---

**4.** This so-called "BFOQ" affirmative defense will be discussed *infra.*

**5.** Defendant does not even mention—much less discuss or distinguish—*Johnson Controls,*

the leading Supreme Court case on this issue. This omission is particularly surprising given that the case was relied upon in Plaintiff's briefing.

that when management asked to meet with her upon learning of her pregnancy, she "kind of already knew what the meeting was going to be"; she expected they were going to order her to discontinue her duties in the fluoroscopy room because "[i]t was kind of in the air" and because "there was another pregnant woman in the cath lab that was asked to leave some time ago." (Betoushana Depo. at 41.) Betoushana also testified that she was aware of Policy # 76300.802 even before the meeting. (*Id.* at 46.)

Hospital officials confirm that they would not allow to Betoushana to continue her duties in the fluoroscopy room, and that they made this clear to her. In a letter summarizing the meeting, Human Resources Associate Susan Paulson recounted that Nana Deeb, the Director of Imaging Services, informed Betoushana that she could not remain in her current position because "hospital policy dictates that employees are removed from fluoroscopic procedures during pregnancy." (Pl's Ex. 9.) Nana Deeb herself submitted a declaration to this Court explaining that the policy in effect during the relevant time period "required a pregnant woman to refrain from engaging in fluoroscopy procedures." (Deeb Decl. 2.)

Similarly, Defendant appears to concede that hospital policy precluded Girard–Simone from continuing to work in the procedure room. In discussing her situation, Defendant highlights, for example, the fact that pregnant women were covered by a 2002 policy requiring those employees who could not perform all their job functions to be transferred out of the Cath Lab. (Def's.Mot.Summ. J. 7.) This indicates that the hospital considers pregnant employees unable to perform all the functions in the Cath Lab. Defendant has not suggested any reason, other than the radiation risk to fetuses, for pregnant employees' alleged inability to do their jobs.

■ Defendant attempts to characterize this case as one about pretext. In other words, can Plaintiff show that Defendant's policy was the but-for cause of the women in question leaving the fluoroscopy procedure room?[6] However, whether or not Betoushana and Girard–Simone requested accommodations is not the point. As already explained, in cases where an employer imposes a facially discriminatory policy on its employees, the burden is *not* on the plaintiff to show pretext.[7] Instead,

---

**6.** That Defendant is taking this tactic is underscored by the fact that its briefing fails even to mention the analysis for a facially discriminatory policy.

**7.** Even if the reasons Betoushana and Girard–Simone left the Cath Lab were germane to this case, the Court would find that the undisputed evidence shows that the women only requested accommodations *after* being told they could not continue to work in the fluoroscopy room.

There is no dispute that Betoushana's "request" to monitor occurred as follows: Upon learning she was pregnant, she informed her supervisor. Either based on his wishes, or "maybe to do with the hospital policy," she "started monitoring only at that time, on the procedure." (Betoushana Depo. at 40.) This was "not in response to anything [she]'d asked for" and she was "satisfied doing the actual scrubbing and X-ray technician work" in the procedure room. (*Id.*) After about a week, she was asked to attend a meeting to discuss her job. As recalled by Susan Paulson, during this meeting "Nana Deeb explained that hospital policy dictates that employees are removed from fluoroscopic procedures during pregnancy." (Pl's.Ex.7.) After that, Betoushana "conveyed [that she] really wanted to stay in the cath lab." (Betoushana Depo. at 48.) She "suggested [she] could work procedures or have monitoring responsibilities" but "Nana again explained that due to the levels of fluoroscopy" it "would not be a safe environment for you or your unborn baby." (Pl's.Ex.7.) Betoushana then "suggested [she] could double vest or kilt" but management worried about the safety of that option as well. (*Id.*)

it is the defendant that must present a valid BFOQ. Otherwise, a violation of Title VII has been established. Period. The particular motivations prompting an individual to leave the Cath Lab do not neutralize a facially discriminatory policy any more than do the good intentions of the hospital.

### 3. *Sufficient Showing of Discrimination*

Defendant argues that two alleged incidents cannot support the finding of a "pattern or practice" of discrimination. This contention lacks merit because it ignores the fact that Defendant's official policy discriminated on its face. *Cf. Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867, 878, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (noting, in a case where the evidence of discrimination was not a facially discriminatory policy but rather anecdotal evidence that black employees were paid and promoted less than that whites, that a "pattern or practice" claim "may fail even though discrimination against one or two individuals has been proved").

Defendant further contends even where a written provision is facially discriminatory, "an allegedly discriminatory provision is not automatically the equivalent of a discriminatory *policy* for purposes of establishing a prima facie case of discrimination absent some showing of enforcement or application of the provision." *E.E.O.C. v. Sears, Roebuck & Co.,* 839 F.2d 302, 355 (7th Cir.1988). Assuming, without deciding, that the Seventh Circuit's standard is also Ninth Circuit law, Plaintiff EEOC has made this showing. It has provided evidence that the discriminatory policy was in force, that hospital management was aware and in support of it, and that it was applied to at least Betoushana and Girard–Simone. Defendant has not provided any evidence to the contrary. In fact, Defendant has never contended that, during the period Policy # 76300.802 was in effect, the hospital allowed women who so chose

It may be true that Betoushana did state at one point that "during her first trimester, she wanted to monitor exclusively." (Deeb Decl. ¶ IX.) However, the undisputed facts show that this conversation happened only after she had been called into a meeting and told she could not continue with her normal responsibilities and only in the context of her prior knowledge of Defendant's discriminatory policy. The only reasonable interpretation of this request is as an attempt to retain part of her job in any way possible, not as a demand to monitor instead of working in the fluoroscopy room. Indeed, Betoushana's undisputed testimony is that she told management that if she could stay in the Cath Lab she would work in "any capacity that [they] could take" her. (Betoushana Depo. at 66.)

There is no dispute that Girard–Simone's "request" to monitor occurred as follows: she was told she would be "removed from the cath lab" after she declared her third pregnancy. (Girard–Simone Depo. at 46.) She was told she was "going to be transferred to a different department," to which she responded that she was "not interested in making a transfer" because "as [she] did [during her] first pregnancy," she could continue to "fulfill [her] job and responsibilities in a very high quality manner." (*Id.*) When the hospital further expressed a "desire for [her] to transfer," she again pleaded that she "wanted to stay." (*Id.* at 51–52.) At this point Nana Deeb suggested "some sort of work for me to do that could occur outside of the ... procedure room" but still within the Cardiac Cath Department. (*Id.* at 53.) Girard–Simone "had an objection" to that proposal "in that [she] wanted to remain monitoring." (*Id.* at 54.)

In context, then, Girard–Simone was requesting to monitor exclusively *as opposed to* transferring out of the department or performing other duties outside the procedure room, *not as opposed* to continuing with her regular duties. In fact, Girard–Simone has made clear that she *did* want to perform her full duties in the Cath Lab: "In December 2002, I was able and willing to perform all my duties as a registered nurse working in the cardiac cath lab." (Girard–Simone Decl. ¶ 4.)

to continue their work in the fluoroscopy procedure room. A reasonable jury could only conclude that the discriminatory policy constituted "the company's standard operating procedure." *Cooper*, 467 U.S. at 876, 104 S.Ct. 2794.[8] Accordingly, the Court finds that, between 1998 and at least 2005 Defendant had a policy that discriminated on the basis of pregnancy.

### B. *Affirmative Defenses*

#### 1. *Bona Fide Occupational Qualification*

Because Defendant enforced a policy that discriminates on its face, Plaintiff EEOC succeeds on its Title VII claim "unless [Defendant] can establish that sex is a 'bona fide occupational qualification.'" *Johnson Controls*, 499 U.S. at 200, 111 S.Ct. 1196. The BFOQ defense allows employers to classify on the basis of sex when such a classification is "reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e)(1). As a matter of law, Defendant cannot succeed on a BFOQ defense in this case.

The Supreme Court has explained that the BFOQ defense is only available in "narrow circumstances"; "[t]he statute thus limits the situations in which discrimination is permissible to 'certain instances' where sex discrimination is 'reasonably necessary' to … job-related skills and aptitudes." *Johnson Controls*, 499 U.S. at 201–02, 111 S.Ct. 1196. Defendant has not argued, much less presented any evidence, that pregnant employees are in any way less capable of performing all the tasks required to work in the Cardiac

Cath Lab then their male counterparts. Instead, Defendant argues that the policy was intended "to protect its female employees and their babies." (Def's. Reply 11.) At oral argument, Defendant again insisted that fetal-safety concerns justify the discrimination. The Court disagrees.

First, Defendant mischaracterizes the federal requirements regarding radiation exposure. Regulations promulgated by the United States Nuclear Regulatory Commission impose higher radiation limits on "declared pregnant women" than on men and nonpregnant women. (Def's. Opp'n. Ex. 13, Regulatory Guide 8.13—Instruction Concerning Prenatal Radiation Exposure, at 4.) Defendant relies on these regulations to urge that it is, in a sense, caught between a rock and a hard place, between complying with federal law and treating all employees equally. However, Defendant omits the crucial fact that the regulations explicitly retain to the *woman* the choice as to whether or not to declare her pregnancy:

> Declared pregnant woman means a woman who has *voluntarily* informed the licensee [employer], *in writing*, of her pregnancy and the estimated date of conception. The declaration remains in effect until the declared pregnant woman withdraws the declaration in writing or is no longer pregnant.

10 C.F.R. § 20.1003 (emphasis added). In sharp contrast, the facially discriminatory policy put in place by Defendant, in addition to imposing a blanket prohibition on their participation in fluoroscopy procedures, *required* "[a]ll pregnant personnel [to] immediately report pregnancy status

---

**8.** Nana Deeb states in her declaration that the policy was easy to enforce because most women request to be removed from fluroscopy procedures. (Deeb Decl. ¶ VII.) Because the undisputed evidence shows that Defendant's policy forbade women from working in

fluoroscopy and that employees were aware of this policy, however, it is impossible to determine how many of those alleged "requests" were in fact made only because the pregnant employees knew they had no choice but to leave.

to the director." (Pl's. Ex. 7, Policy # 76300.802.) [9] Defendant is thus not required by federal regulations to limit all pregnant women's exposure to radiation; it is only required to limit the exposure of those women who voluntarily "declare" their pregnancy in writing. Yet, the discriminatory policy at issue makes such pregnancy declarations mandatory.[10]

Second, and more importantly, the Supreme Court has roundly rejected fetal safety as a defense to policies that facially discriminate on the basis of pregnancy. In *Johnson Controls,* the employer had a policy of prohibiting pregnant women and women who could become pregnant from working in battery-manufacturing jobs because they involved exposure to lead. The employer argued that this facial discrimination was justified by a BFOQ because of the safety risk that exposure to lead could pose to a fetus. *Johnson Controls,* 499 U.S. at 202, 111 S.Ct. 1196. The Supreme Court struck down the policy, holding that the BFOQ's "safety exception is limited to instances in which sex or pregnancy actually interferes with the employee's ability to perform the job." [11]   *Id.* at 204, 111 S.Ct. 1196.

The Court's reasoning is worth recounting. It noted that the purpose of the PDA was to ensure that "women as capable of doing their jobs as their male counterparts may not be forced to choose between having a child and having a job." *Id.* "Employment late in pregnancy often imposes risks on the unborn child," the Court reminded, but "[d]ecisions about the welfare of future children must be left to the parents who conceive, bear, support, and raise them rather than to the employers who hire those parents." [12]   *Id.* at 205–06, 111 S.Ct. 1196. Otherwise, we as a society would send the message that we trust employers more than we trust women to make decisions about their own bodies and their own destinies.

Indeed, the Court cautioned that paternalistic "[c]oncern for a woman's existing or potential offspring historically has been the excuse for denying women equal employment opportunities." *Id.* at 211, 111 S.Ct. 1196. Therefore, the United States Supreme Court admonished:

> It is no more appropriate for the courts than it is for individual employers to decide whether a woman's reproductive role is more important to herself and

**9.** Defendant may have known this policy did not comply with federal law, for its revised 2005 policy follows the Nuclear Regulatory Commission's lead by making it optional for a woman to officially "declare" her pregnancy.

**10.** The Court encourages all employers to be mindful of their pregnant employees, to ensure that employees are aware of any radiation risks and to accommodate those women who voluntarily declare their pregnancies in order to limit their exposure to radiation. Here, however, the Court is faced with a facially discriminatory policy which strips women of any agency in their occupational destinies while pregnant, and that the Court cannot condone.

**11.** Defendant's contention that it rejected Betoushana's offer to wear a double layer of

protective vests because of the potential safety risks to other employees is yet another red herring. That any number of proposed accommodations might well be unreasonable because they are unsafe for other employees in no way justifies a blanket policy that discriminates on its face.

**12.** Moreover, to the extent that an employer might worry about potential tort liability for fetal injuries, the Court noted that "[w]ithout negligence, it would be difficult for a court to find liability on the part of the employer. If, under general tort principles, Title VII bans sex-specific fetal-protection policies, the employer fully informs the woman of the risk, and the employer has not acted negligently, the basis for holding an employer liable seems remote at best." *Johnson Controls,* 499 U.S. at 208, 111 S.Ct. 1196.

her family than her economic role. Congress has left this choice to the woman to make.[13]

*Id.* *Johnson Controls* means what it says. This Court will not sanction a facially discriminatory policy on the basis that an employer thinks it is for the woman's own good.[14] Accordingly, the Court grants Plaintiff's motion for summary adjudication that Defendant cannot raise the BFOQ defense.

### 2. *Administrative Defenses*

Defendant contends that Girard–Simone's claim is barred because she failed to exhaust her administrative remedies by filing a timely charge of discrimination with the EEOC, and, for the same reason, that her claim is barred by the statute of limitations requiring an aggrieved party to file a charge within 300 days of the unlawful conduct.[15] *See* 42 U.S.C. § 2000e–5(e)(1). The Court rejects these arguments because the EEOC, not Girard–Simone, is the Plaintiff in this action.

■■■■ The EEOC is not subject to any statute of limitations restriction on its ability "to file suit in a federal court." *Occidental Life Ins. Co. of Cal. v. E.E.O.C.*, 432 U.S. 355, 366, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). With respect to exhaustion, "[i]n a Title VII representative suit, unnamed class members need not individual-ly bring a charge with the EEOC as a prerequisite to joining the litigation." *Bean v. Crocker Nat'l Bank,* 600 F.2d 754, 759 (9th Cir.1979). This is so because "the EEOC is not merely a proxy for the victims of discrimination"; instead, "[w]hen the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination." *Gen. Tel. Co. Of Nw., Inc. v. E.E.O.C.,* 446 U.S. 318, 326, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). The EEOC may thus seek relief for Girard–Simone and any other employees who may have been affected by Defendant's discriminatory policy even though they have not complied with the requirements necessary to bring private actions on their own. Accordingly, Plaintiff's motion for summary adjudication of these issues is granted.

### 3. *Laches*

■■■■ "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *United States v. Dang,* 488 F.3d 1135, 1144 (9th Cir.2007) (internal quotation marks omitted). Assuming for present purposes only that there is a question of material fact as to whether the EEOC unreasonably delayed in bringing this action, the laches

**13.** For this reason, the fact that many pregnant employees may in fact seek to avoid working in fluoroscopy in no way justifies an official policy excluding them. "It is correct to say that Title VII does not prevent the employer from having a conscience. The statute, however, does prevent sex-specific fetal-protection policies. These two aspects of Title VII do not conflict." *Id.* at 208, 111 S.Ct. 1196.

**14.** Moreover, both parties' radiation experts agree that "a pregnant woman does not have to be removed from the cardiac cath" lab because the radiation "dose that they potentially could receive would be below the regu-latory limits." (Def's. Ex. 14, Takahashi Depo. at 64.) In other words, it is not necessarily unsafe for pregnant women to work in the Cath Lab. Of course, a pregnant employee who feels her fetus is at risk or needs an accommodation due to a pregnancy-related condition may well have that legal right. *See, e.g.,* Cal. Gov.Code §§ 12940, 12945 (requiring that reasonable accommodations be made for pregnancy-related conditions).

**15.** Defendant concedes that Betoushana has met her administrative prerequisites to filing a suit.

defense fails as a matter of law because there is no evidence that Defendant was prejudiced by this delay. Defendant asserts that one of its witnesses, Sonni Logan, has since moved out of state, "making it difficult and expensive to depose her and call her as a witness at trial." (Def's. Opp'n 14.) However, the Court notes that Defendant was in fact able to depose her and has not suggested she will be unavailable to attend a trial. A review of the case law has convinced the Court that this potential extra cost is not the sort of prejudice that would justify a laches defense. *Cf. Boone v. Mech. Specialties Co.*, 609 F.2d 956, 959–60 (9th Cir.1979) (affirming a finding of prejudice where the plaintiff had delayed seven years in bringing his lawsuit and "most of the witnesses are no longer available").

#### 4. *Unclean Hands*

■■■ "The unclean hands doctrine closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 876–77 (9th Cir.2000) (internal quotation marks omitted). Defendant claims that "it is inequitable and bad faith for the EEOC to claim on behalf of Avril Betoushana that she was removed from the cath lab when she testified that she wanted to monitor only." (Def's. Opp'n 9.) However, as discussed *supra*, the undisputed facts show that Defendant maintained a facially discriminatory policy, and that Betoushana was removed from the Cath Lab pursuant to that policy. Whatever her personal motivations may have been do not mitigate or justify that policy, and it is the policy that the EEOC challenges in this lawsuit. Under these circumstances, the Court finds that Defendant has presented no evidence

that would support a defense of unclean hands.

In light of the above analysis, the Court grants summary adjudication on liability in favor of Plaintiff. Ultimately, the case is straightforward. Under *Johnson Controls*, Defendant's policy violates Title VII unless it can demonstrate a valid BFOQ. The only BFOQ Defendant asserts is one that was rejected by the United States Supreme Court in 1991. The other potential affirmative defenses raised by Defendant are without merit. Accordingly, as a matter of law, Plaintiff EEOC has proven liability.

#### C. *Injunction*

■■■ Defendant argues that Plaintiff is not entitled to injunctive relief as a matter of law because the discriminatory policy is no longer in effect. Plaintiff responds that it is unclear whether the 2005 policy in fact replaced the earlier unlawful policy, and that in any case, the old policy may as a practical matter still be in effect. Indeed, Policy # 86600.1117 does not mention, much less explicitly revise or rescind, the facially discriminatory policy. Because Policy # 76300.802's provision excluding pregnant women from fluoroscopy procedures may still be in effect, thus requiring injunctive relief of some kind, the Court denies summary adjudication on this issue.

#### D. *Punitive Damages*

Defendant argues that punitive damages are not available in this case as a matter of law. The Court disagrees.

■■■ Title VII allows for punitive damages where an employer "engaged in a discriminatory practice . . . with malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Supreme Court has made clear that "[t]he terms 'malice' or 'reckless indifference' pertain to

the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Moreover, liability for punitive damages does not require a showing that the employer "engage[d] in conduct with some independent, 'egregious' quality"; instead "the reprehensible character of the conduct is not generally considered apart from the requisite state of mind." *Id.* at 538, 119 S.Ct. 2118.

■ Put another way, in Title VII cases, "an employer may be liable for punitive damages in any case where it 'discriminates in the face of a perceived risk that its actions will violate federal law.'" *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000) (quoting *Kolstad*, 527 U.S. at 536, 119 S.Ct. 2118). "Thus, in general, intentional discrimination is enough to establish punitive damages liability." *Id.* As already discussed, the Court finds that Defendant has engaged in intentional discrimination as a matter of law by implementing an official policy that facially discriminates on the basis of sex.

The Supreme Court has, however,

set forth three areas in which the factfinder could find intentional discrimination but the defendant would nonetheless not be liable for punitive damages. First, if the theory of discrimination was novel or poorly recognized, the employer could reasonably believe that its action was legal even though discriminatory. Second, the employer could believe it had a valid BFOQ defense to its discriminatory conduct. Third, in some (presumably rare) situations, the employer could actually be unaware of Title VII's prohibition against discrimination. Common to all of these exceptions is that they occur when the employer is aware of the specific discriminatory conduct at issue, but nonetheless reasonably believes that conduct is lawful. Under such circumstances, an employer may not be liable for punitive damages.

*Id.* (citing *Kolstad*, 527 U.S. at 536–37, 119 S.Ct. 2118). The Court finds that punitive damages are available in this case.

■ Plaintiff has shown that Defendant imposed its unlawful policy starting in 1998 even though the Supreme Court had explicitly held seven years earlier that those that policies that restrict pregnant women from certain positions constitute facial sex discrimination. Because this theory of discrimination is neither novel nor poorly recognized, a jury could find that Defendant could not have reasonably believed its policy was legal.

Defendant has never suggested it is unaware of Title VII's well-known policy forbidding discrimination, or that the statute's protections encompass pregnancy. Instead, it insists that it "never had any intent to discriminate, its intent at all times was to protect its pregnant employees and their fetuses." (Def's. Reply 12.) However, *Johnson Controls* made clear in 1991 that an intention to protect fetuses did not justify classifications on the basis of pregnancy. Therefore, a jury could conclude that Defendant could not have reasonably believed that the fetal-protection rationale would constitute a valid BFOQ defense.

Defendant may in fact have instituted its unlawful policy in an attempt to protect its pregnant workers and their fetuses. It may have had no "evil motive" whatsoever in the way one might normally think of the phrase. That is not the standard for imposing punitive damage liability, however. If the jury believes that Defendant acted with the knowledge or reckless disregard of the fact that it was violating federal law,

it is subject to punitive damage liability, even if it honestly believes that classifications in an attempt to protect fetuses should not count as discrimination. Accordingly, the Court leaves the question of punitive damages to a jury.

## IV. CONCLUSION

Based on the foregoing analysis, the Court grants summary judgment in favor of Plaintiff EEOC on the issue of liability, and sends the question of punitive damages to a jury.

IT IS SO ORDERED.